UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CITIMORTGAGE, INC.,                   )
                                      )
          Plaintiff,                  )
                                      )
     vs.                              )          Case No. 4:10CV1863 JAR
                                      )
ALLIED MORTGAGE GROUP, INC.,          )
                                      )
          Defendant.                  )

## MEMORANDUM AND ORDER

This matter comes before the Court on CitiMortgage, Inc.'s Motion to Exclude the Opinions

of Donald Coker (ECF No. 52), Plaintiff's Motion for Summary Judgment (ECF No. 58), and

Plaintiff CitiMortgage, Inc.'s Motion to Strike Affidavit of Wendy Monaco (ECF No. 76).  Because

the Court grants Plaintiff's Motion for Summary Judgment, the Court does not address

CitiMortgage, Inc.'s Motion to Exclude the Opinions of Donald Coker and Plaintiff CitiMortgage,

Inc.'s Motion to Strike Affidavit of Wendy Monaco.[1]

## BACKGROUND

Plaintiff CitiMortgage, Inc. ("CMI") purchases closed loans from approved lenders,

including lenders known as "correspondents," across the United States under its Loan Purchasing

Program ("the Program").  (Plaintiff's Statement of Uncontroverted Material Facts ("SUMF"), ECF

No. 60, ¶1).  CMI then resells some of the loans it purchases to the Federal National Mortgage

Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and

---

[1]Moreover, this Court previously held that the Agreement (defined herein) is unambiguous.
(ECF No. 51).  As Mr. Coker's report and Ms. Monaco's affidavit purport to provide extrinsic
evidence related to Defendant's understanding of the agreement, they are irrelevant.  See Weitz Co.
v. MH Washington, 631 F.3d 510, 524 (8th Cir. 2011)("Under Missouri law, determining the
meaning of an unambiguous provision is a question of law for the court, determined by giving
language its plain and ordinary meaning without resort to extrinsic evidence.").

other investors in the secondary mortgage market.  (Id., ¶3).  For example, in 2007, CMI purchased

more than 400,000 loans from numerous correspondents.  (Id., ¶4).

CMI and Defendant Allied Mortgage Group, Inc. ("Allied") entered into their Correspondent

Agreement Form 200 on March 26, 2004 (the "Form 200"), a Delegated Underwriting Addendum

to the Form 2000, dated as March 26, 2004 (the "Addendum"), and a Bulk Purchase Agreement to

the Form 200, dated as of June 8, 2006 (the "Amendment") (collectively, "the Agreement").  (Id.,

¶¶8, 9).  The Agreement provided the terms and conditions that governed Allied's sale of loans to

CMI under the Program.  (Id., ¶10).  Among other requirements, the Agreement provided that, for

each loan sold to CMI under the Program, Allied must deliver certain loan documents to CMI.  (Id.,

¶11).  Under the Agreement, CMI could require Allied to repurchase any loan that CMI, in its sole

and exclusive discretion, determined was defective because it was underwritten or originated or

based on materially inaccurate information or material misrepresentations and/or was in violation

of the terms of the Agreement and applicable underwriting guidelines and/or must be repurchased

from Fannie Mae, Freddie Mac, or secondary market investor.  (Id., ¶12).  This cure or repurchase

provision was found in Section 11 of the Form 200, which provided:

> If CMI, in its sole and exclusive discretion, determines any Loan purchased pursuant
> to this Agreement:
>
> (i) was underwritten and/or originated in violation of any term, condition,
> requirement or procedure of this Agreement or the CMI Manual in effect as of the
> date CMI purchased such Loan;
>
> (ii) was underwritten and/or originated based on materially inaccurate
> information or material misrepresentation made by the Loan borrower(s), [Allied],
> [Allied's] directors, officers, employees, agents, independent contractors and/or
> affiliates or any other party providing information relating to said Loan;
> ...
> (iv) must be repurchased from any secondary market investor (including but
> not limited to the Fannie Mae, Freddie Mac, FHA, VA, HUD or Government
> National Mortgage Association) due to a breach by [Allied] of any representation,
> warranty or covenant contained in this Agreement of the CMI Manual or a failure by

[Allied] to comply in all material respects with the applicable CMI Manual terms, conditions, requirements and procedures; ....

[Allied] will, upon notification by CMI, correct or cure such defect within the time prescribed by CMI to the full and complete satisfaction of CMI.  If, after receiving such notice from CMI, [Allied] is unable to correct or cure such defect within the prescribed time, [Allied] shall, at CMI's sole discretion, either (i) repurchase such defective Loan from CMI at the price required by CMI ("Repurchase Price"), or (ii) agree to such other remedies (including but not limited to additional indemnification and/or refund of a portion of the Loan purchase price) as CMI may deem appropriate. If CMI requests a repurchase of a defective Loan, [Allied] shall, within ten (10) business days of [Allied's] receipt of such repurchase request, pay to CMI the Repurchase Price...  If such defective Loan is owned by CMI at the time of the repurchase by [Allied], CMI shall ... execute and deliver such instruments of transfer or assignment ... as shall be necessary to vest in [Allied] or its designee title to the repurchased loan.

(Id., ¶14).

In addition, Section 10 of the Agreement included an indemnification provision in the event

Allied breached the Agreement:

[Allied] agrees to indemnify and hold CMI harmless from any and all claims, actions and costs, including reasonable attorneys' fees and costs, arising from (i) [Allied's] performance or failure to perform under the terms, conditions or obligations of this Agreement or the CMI Manual... (ii) any fraud, misrepresentation or breach of any representation, warranty or covenant contained [in] this Agreement or the CMI Manual...

(Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment

("Response"), ECF No. 63, pp. 7-8).

Since 2004, Allied sold over 2,560 loans to CMI pursuant to the Agreement.  (SUMF, ¶20).

The combined funded amount of these loans totals over $316,000,000.00. (Id.).

## A.  The Loans at Issue

In this litigation, CMI asks the Court to order Allied to pay the Repurchase Price (defined

herein) for nine (9) loans (collectively, the "Loans"): Alinea Loan #XXXXX2944, on 6 Kravchenok,

Parlin, NJ 08859, dated November 27, 2006; Bent Loan #XXXXX3795, on 95 Topliff Street 1,

Dorchester, MA 02122, dated April 27, 2007; Fernandez Loan #XXXXX8703, on 9611 Richmond

Avenue, Houston, TX 77063, dated February 22, 2007; Karan Loan #XXXXX2459, on 926 Gotts

Road, Davenport, FL 33837, dated February 26, 2007; Kovar Loan #XXXXX7462, on White Flower

Circle, Villa Rica, GA 30180, dated February 29, 2007; Pressley Loan #XXXXX3402, on 201 ½

Philadelphia Pike Unit 103, Wilmington, DE 198809, dated November 10, 2006; Stroud III Loan

#XXXXX6993, on 6640 Louisville, New Orleans, LA 70124, dated November 30, 2007; Watson

Loan #XXXXX7454, on 51 Fields Avenue, Memphis, TN 38109; and Weston Loan #XXXXX6216,

on 5626 Maple Tree Drive, Memphis, TN 38115, dated October 30, 2006.  (Id., ¶¶21-30).  After

purchasing the Loans from Allied, CMI alleges that it became aware of facts indicating that certain

information contained in the loan application packages for the Loans was materially inaccurate or

was materially misrepresented or that the Loans were otherwise defective.  (Id., ¶¶31-68).[2]

## B.  Demand for Cure or Repurchase

In its sole and exclusive discretion, CMI determined that the Loans were underwritten and/or

originated based upon materially inaccurate information or material misrepresentations or were

otherwise defective.  (Id., ¶80).  CMI notified Allied that the Loans were defective and demanded

that Allied cure the defects or repurchase the Loans pursuant to the Agreement.  (Id., ¶¶81-82).

Allied did not cure the defects or repurchase the Loans in response to these initial requests.  (Id.,

¶¶83).  Allied did not provide any evidence disproving the misrepresentations, misstatements, and

other defects in the Loans.  (Id., ¶84).  Thereafter, CMI sent final notices to Allied, demanding that

Allied repurchase the Loans, but Allied again did not repurchase the Loans.  (Id., ¶¶85-88).

---

[2]CMI goes into great detail as to why the Loans were materially inaccurate or contained material misrepresentations or that the Loans were otherwise defective.  (Id., ¶¶32-68).  It does not appear that Allied is arguing that there were not misrepresentations, misstatements or other defects in the Loans related to the borrowers' statements of income and assets.  As such, the Court does not specifically outline the problems with each individual Loan.

**C.  Damages**

CMI calculates its damages as the "Repurchase Price," as that price is calculated in the Agreement.  (Id., ¶89-91).  Section 2301 of the CMI Manual defines the Repurchase Price as follows:

> [T]he sum of (i) the current principal balance on the loan as of the paid-to date; (ii) the accrued interest calculated at the mortgage loan Note rate from the mortgage loan paid-to date up to and including the repurchase date; (iii) all unreimbursed advances (including but not limited to tax and insurance advances, delinquency and/or foreclosure expenses, etc.) incurred in connection with the servicing of the mortgage loan; (iv) any price paid in excess of par by CitiMortgage on the funding date; and (v) any other fees, costs, or expenses charged by or paid to another investor in connection with the repurchase of the mortgage loan from such investor but only to the extent such fees, costs and expenses exceed the total of items (i) through (iv) above.

(Id., ¶92).  CMI calculates the total Repurchase Price due CMI under the nine loans at issue in this litigation is $1,084,639.05.  (Id., ¶¶93-103).

**D.  The Litigation**

On October 4, 2010, CMI commenced this breach of contract action against Allied.  (ECF No. 1).  CMI alleges that Allied delivered nine loans that failed to conform to the terms of the Agreement and subsequently refused to cure or repurchase these Loans, thereby breaching the contract.

**SUMMARY JUDGMENT STANDARD**

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56©; Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011).  The substantive law determines which facts are critical and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Only

disputes over facts that might affect the outcome will properly preclude summary judgment.  Id. Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex Corp., 477 U.S. at 323.  Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute."  Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 248.  The nonmoving party may not rest upon mere allegations or denials of its pleading. Anderson, 477 U.S. at 258.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. Celotex Corp., 477 U.S. at 331.  The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"  Torgerson, 643 F.3d at 1042 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).

## DISCUSSION

## I.   CITIMORTGAGE, INC.'S MOTION FOR SUMMARY JUDGMENT

CMI makes a prima facie case for breach of contract.  Under Missouri law, the elements for a breach of contract are: "(1) the existence of an enforceable contract between the parties to the action; (2) mutual obligations have arisen under the contract terms; (3) defendant has not performed its obligations imposed by the contract; and (4) plaintiff was thereby damaged."  Superior Insurance Com. v. Universal Underwriters Insurance Company, 62 S.W.3d 110 (Mo. Ct. App. 2001).  Here,

- 6 -

the parties entered into the Agreement, which provided for mutual obligations.  CMI asserts that

Allied did not perform its obligation to repurchase the Loans, and that CMI was thereby damaged.[3]

Allied admits that defects were found in each of the Loans.  (Response, pp. 21-25; Reply,

pp. 6-7).  Likewise, Allied admits that CMI determined that the Loans were defective pursuant to

one or more subsections of Section 11.  (Allied's Responses to CMI's Statement of Uncontroverted

Facts ("SSUF Response"), ECF No. 64, ¶¶31-71, 80; Reply, pp. 4-5).  Section 11 of the Agreement

provides that CMI, upon determining in its own discretion that the Loans are defective, may demand

cure or repurchase of the Loans.  Thus, Allied's failure to repurchase the Loans after demand by

CMI constitutes a breach of contract.

In sum, the Court finds that CMI has proven all of the elements to make a prima facie breach

of contract claim.  CMI found, in its exclusive discretion, that there were defects in the Loans.  CMI

asked Allied to repurchase the Loans, and Allied refused.  CMI, therefore, is entitled to summary

judgment unless there is an affirmative or absolute defense that would preclude entry  in CMI's

favor as a matter of law.

### A.      Affirmative Defenses

In its answer, Allied raises 38 affirmative defenses.  (ECF No. 13, pp. 7-12).  In its Response,

however, Allied raises only seven affirmative defenses: Affirmative Defense No. 29 (Ambiguity),

No. 25 (Breach of the Implied Covenant of Good Faith and Fair Dealing), No. 26

(Unconscionability), No. 27 (Adhesion), No. 12 (In Pari Delicto), No. 13 (Unclean Hands), and No.

14 (Laches).  The Court assumes Allied abandons the other affirmative defenses raised in its

---

[3]CMI's breach of contract claims are virtually identical to the breach of contract claims CMI filed against OCM Bancorp, Inc. ("OCM") and Just Mortgage, Inc. ("Just Mortgage").  See Citimortgage, Inc. v. OCM Bancorp, Inc., No. 4:10CV467CDP, 2011 U.S. Dist. LEXIS 45437 (E.D. Mo. Apr. 27, 2011); CitiMortgage v. Just Mortg., Inc., No. 4:09 CV 1909, 2012 U.S. Dist. LEXIS 43522 (E.D. Mo. Mar. 29, 2012).

Answer.  Broad. Music, Inc. v. Edcon Enters., LLC, No. 4:11-CV-1950, 2012 U.S. Dist. LEXIS

107461, at *11, n. 2 (E.D. Mo. Aug. 1, 2012)("As a general rule, the failure to raise an affirmative

defense in opposition to a motion for summary judgment constitutes an abandonment of the

defense.")(citing cases).  As discussed herein, the Court finds that none of the seven defenses Allied

raises in its Response are sufficient to raise a triable issue of fact and CMI remains entitled to

summary judgment on its claims.

       1.     Ambiguity

The Just Mortgage court outlined when a contract will be considered ambiguous:

> A contract is ambiguous where reasonable people could fairly and honestly differ in
> the reading of the terms because the terms are susceptible of more than one
> interpretation. Yerington v. La-Z-Boy, Inc., 124 S.W.3d 517, 520 (Mo. Ct. App.
> 2004); accord Kastendieck v. Millers Mut. Ins. Co., 946 S.W.2d 35, 39 (Mo. Ct.
> App. 1997) ("An ambiguity exists where there is duplicity, uncertainty or
> indistinctness in the meaning of the words used."). In addition, "if language which
> appears plain considered alone conflicts with other language in the contract, or if
> giving effect to it would render other parts of the contract a nullity, then [the court
> should] find the contract to be ambiguous." Zeiser v. Tajkarimi, 184 S.W.3d 128,
> 133 (Mo. Ct. App. 2006). Similarly, "language which promises something in one
> point and takes it away in another is ambiguous." Kastendieck, 946 S.W.2d at 39. In
> construing a contract, the court should "attribut[e] a reasonable meaning to each
> phrase and clause, and harmoniz[e] all provisions of the agreement" rather than
> "leave[] some of the provisions without function or sense." Teets v. Am. Fam. Mut.
> Ins. Co., 272 S.W.3d 455, 467 (Mo. Ct. App. 2008) (citation omitted). Whether or
> not a contract is ambiguous is a question of law for the court to decide. Id. at 462.

Just Mortgage, 2012 U.S. Dist. LEXIS 43522, at *35-36.

Allied again argues that Sections 2(i), 10 and 11 of the Agreement are patently ambiguous.

(Response, pp. 5-13).[4]  Allied asserts that allowing CMI to treat Section 11 of the Agreement as a

---

   [4]The Court previously addressed the ambiguity argument in its Order on Allied's Motion to
Compel Disclosure (ECF No. 39).  In its Order, the Court ruled that "no ambiguity exists between
§2(I) and §11(ii).  (ECF No. 51, p. 8).  The Court stands by this determination.  CitiMortgage, Inc.
v. Allied Mortg. Group, Inc., No. 4:10CV01863, 2012 U.S. Dist. LEXIS 60790, at *10-12 (E.D. Mo.
May 1, 2012)

"strict liability" provision would render Section 2(i) and Section 10 of the Agreement completely meaningless. (Response, p. 5).

Section 2 of the Agreement, labeled "Representations and Warranties" provides:

Correspondent represents warrants and covenants throughout the term of this Agreement as follows:

***

(i) That neither this Agreement nor any statement, report or other information provided or to be provided pursuant to this Agreement (including but not limited to the statements and information contained in the documentation for each loan purchased by CMI) contains or will contain any misrepresentation or untrue statement of facts or omits or will omit to state a fact necessary to make the information not misleading. **The provisions of this sub-section shall not apply** to information obtained from (i) appraisers, escrow agents, title companies, closers, credit reporting agencies or any other entity approved from CMI ("Approved Entity") **unless Correspondent knows or has reason to believe that any information provided by such Approved Entity is not true, correct or valid in any material respect and** (ii) the Loan applicant(s) **unless Correspondent knows, has reason to believe or, after performing its normal due diligence and quality control review, should have known that any information provided by the Loan applicant(s) is not true, correct or valid in any material respect.**

(Response, p. 7)(emphasis in Response). Allied contends that the safe harbor provision in Section 2 conflicts with the purported strict liability provision in Section 11. (Id., pp. 7-8). Allied maintains that CMI improperly attempts to limit Section 2(i) to Section 10 of the Agreement and assume that Section 11 is immune from the knowledge provision of Section 2(i). Allied asserts that this is an incongruous distinction because Sections 10 and 11 of the Agreement are the same in terms of the triggering events and the relief afforded under them. (Id., p. 8). Allied claims that both provisions are triggered by "the existence of material misrepresentations resulting in one or more defects in a loan sold to CMI" under the Agreement. (Id.). Allied argues that whether the relief available under Sections 10 and 11 of the Agreement is termed repurchase (Section 11) or indemnification (Section 10) "is solely a semantic difference--the result is the same, and thus Allied's liability under those substantially identical provisions should be the same." (Id., p. 9).

- 9 -

Allied also suggests that there are ambiguities between Sections 2202 and 248 of the CMI Manual and Section 11 of the Agreement. Allied claims these sections, along with Sections 2(i) and 10 of the Agreement, vary "simply" and "radically" regarding what standard will be applied in determining the requirements under which it will be obligated to repurchase and/or indemnify losses for loans Allied sold to CMI.   (Id., p. 10).   Section 2202 of the CMI Manual, called "REPRESENTATIONS AND WARRANTIES," contains a subheading, "Fraud and Misrepresentation," which provides:

> As of the date the Loan was originated, ***except as qualified in section 2(i)*** of the Correspondent Loan Purchase Agreement, the Correspondent represents and warrants that all information relating to the Loan was complete and accurate, and contained no fraud or misrepresentation, whether the information was obtained, derived or requested by a third party or an affiliate of the Correspondent or otherwise, or by the Correspondent.

(Response, p. 9)(emphasis in Response).   Allied argues that this section qualifies Allied's liability to only those loans with defects it knew of or should have known of; Allied claims this qualification supports the conclusion that Sections 2(i), 10 and 11 of the Agreement, as well as Section 2202 of the CMI Manual are ambiguous.  (Id., p. 10).

Likewise, Allied notes that, under Section 248,  it was precluded from verifying income on Stated Income products.  Section 248 of the CMI Manual, called "PROGRAM DESCRIPTIONS," contains a subheading, "Asset Based Stated Income Program."  (Id.).  This section provides, "If income is documented in loan file, the loan is no longer eligible for a stated income or no income program." (Id.).  Allied claims that its inability to verify borrowers' incomes and assets cuts in its favor because it should not be held liable for misrepresentations which it could not have verified or otherwise prevented.  (Id.).  Allied contends that barring it from verifying borrower statements of income further supports the conclusion that Sections 2(i), 10 and 11 of the Agreement and Sections 248 and 2202 of the CMI Manual are reasonably susceptible of more than on construction. (Id.).

- 10 -

Several Courts have addressed the ambiguity issue and found no ambiguity between §2(i) and §11.  As this Court previously recognized, there is no ambiguity or conflict between these sections:

> Section 2(i) and § 2202 are representation and warranty sections, the terms of which are limited to each  subsection. Section 2(i) and § 2202 are breached when a correspondent knows or should have known that loan documents contain misstatements, misrepresentations, or omissions but nonetheless submits the defective documents to CitiMortgage. Section 11(ii) sets forth one set of circumstances in which CitiMortgage can demand a correspondent cure or repurchase a loan, specifically, upon CitiMortgage determining that the loan was underwritten or originated based on a misstatement, misrepresentation, or omission. Section 11(ii) is breached when a correspondent fails to cure or repurchase the loan, and applies regardless of the correspondent's knowledge.
>
> That § 2(i) and § 2202 are limited to those instances where the correspondent knows or should have known of the misstatement, misrepresentation, or omission does not conflict or create an ambiguity when read with § 11(ii). ...

Just Mortgage, 2012 U.S. Dist. LEXIS 43522, at *38-39.

The Court also finds Allied's argument that Section 10 creates an ambiguity with respect to Section 11(ii) to be unpersuasive because these Sections do not have the same triggering events or remedy provisions.  First, Section 10 only becomes operable when there is a breach of the Agreement. Section 10 is a general indemnification provision, which is applicable to breaches of the Agreement, including breaches of any representations or warranties such as those set out in Sections 2(i) and 2202.  In contrast, Section 11 allows CMI to demand cure or repurchase when there has been a misrepresentation, even absent of any breach.  See Just Mortgage, 2012 U.S. Dist. LEXIS 43522, at *38 ("Section 11(ii) is breached when a correspondent fails to cure or repurchase the loan, and applies regardless of the correspondent's knowledge.").  Second, "[t]he remedies available for breach of § 2(i) also differ from those available for a breach of § 11(ii). Remedies for a breach of § 2(i) are set forth in § 10, while the available remedies for a breach of § 11(ii) are [CMI's] ability to demand that the correspondent cure or repurchase the defective loan and any other such remedies

- 11 -

as [CMI] deems appropriate."  <u>Just Mortgage</u>, 2012 U.S. Dist. LEXIS 43522, at *30. Likewise, Section 11 provides that CMI's rights under Section 11 do not affect any indemnification obligations Allied has under Section 10 for breach of the Agreement independent of Section 11.  <u>See</u> Reply, p. 15.

Based upon the above reasoning and as discussed by this Court previously, the Court finds that Allied has not demonstrated that §§ 2(i), 10, 11(ii), 2202, and 248 when read together, are ambiguous and conflicting.[5]  Accordingly, Allied has not proven the defense of ambiguity.  <u>See Scenic Holding, LLC v. New Bd. of Trs. of the Tabernacle Missionary Baptist Church, Inc.</u>, 506 F.3d 656, 670 (8th Cir. 2007)("The burden of proving a defense of an affirmative nature is upon the defendant.")(citation omitted); <u>Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.</u>, 387 F.3d 705, 714 (8th Cir. 2004)("The specificity requirement of Rule 56 applies with equal force where the defendant opposes summary judgment, especially where the defendant resists by asserting affirmative defenses which it has a burden to prove."); <u>Herd v. Am. Sec. Ins. Co.</u>, 501 F. Supp. 2d 1240, 1245 (W.D. Mo. 2007)(burden of proof for establishing an affirmative defense is on the defendant).

## 2. Good Faith and Fair Dealing

Allied argues that CMI abused the "sole and exclusive" discretion afforded it under the Agreement, thereby breaching the implied covenant of good faith and fair dealing.  (Response, pp. 13-14).  Allied also asserts that CMI exercised bad faith by creating and developing "defective" loan

---

[5]Similarly, the Court finds no basis for finding that Section 248 makes the Agreement ambiguous.  As discussed herein, Allied had the option not to utilize CMI's Stated Income products, and instead use products that allowed Allied to verify the borrowers' income and assets.  Therefore, Allied's argument that it should not be held liable for misrepresentations which it could not have verified or otherwise prevented is unfounded.  Allied could have verified this information, and not have been subject to the strict liability provisions, if it had utilized one of CMI's non-Stated Income products.

guidelines for a Stated Income Loan product that CMI knew "showed a marked propensity towards default." (Id., p. 13).

Allied, however, fails to address relevant case law that found no bad faith by CMI under similar circumstances.  As noted by the OCM court, "to establish a breach of the covenant of good faith and fair dealing, there must be evidence that the party with the discretion exercised its discretion in such a way so as to evade the spirit of the transaction or deny the other party the expected benefit of the contract."  OCM Bancorp, 2011 U.S. Dist. LEXIS 45437, at *10.  As previously discussed, Allied does not dispute that there were defects in the Loans.  Instead, Allied simply argues that, despite these defects, CMI would be acting in bad faith to demand the repurchase of the Loans because CMI knew of the high default rate of Stated Income products.

The Court finds that "[t]here can be no bad faith if [CMI] simply performed the actions expressly granted it by the parties' agreement, including determining that loans were defective and needed to be repurchased."  OCM Bancorp, 2011 U.S. Dist. LEXIS 45437, at *11.  It is undisputed that CMI acted in accordance with the provisions of the Agreement and the unfettered discretion afforded to CMI therein.   Likewise, CMI's purported knowledge "concerning market conditions and the efficacy of its guidelines does not implicate whether it exercised its discretion to demand cure or repurchase of the ... Loans in good faith." Just Mortg., Inc., 2012 U.S. Dist. LEXIS 43522, at *45.  In sum, Allied has not shown that CMI "exercised a judgment conferred by the express terms of the agreement in such a manner as to evade the spirit of the transaction or so as to deny [Allied] the expected benefit of the contract." CitiMortgage, Inc. v. First Cal. Mortg. Co., No. 4:10 CV 1498 RWS, 2011 U.S. Dist. LEXIS 154568, at *5 (E.D. Mo. Nov. 29, 2011).  Accordingly, the Court finds that Allied has failed to meet its burden of proof on the defense that CMI acted in bad faith in its performance of the Agreement.

### 3.    Unconscionability/Adhesion

- 13 -

Allied raises the defenses of unconscionability and adhesion. These defenses are related, but distinct defenses. See Surman v. Merrill Lynch, Pierce, Fenner & Smith, 733 F.2d 59, 61 (8th Cir. 1984)(noting that a court may deny giving effect to an "unconscionable" clause in a standardized contract of adhesion); International Harvester Credit Corp. v. Leaders, 818 F.2d 655, 659 (8th Cir. 1987)(a contract of adhesion is not automatically unconscionable, but rather must be examined in light of several factors). The Courts in this district have discussed the elements for what constitutes an unconscionable contract or provision or a contract of adhesion:

> Under Missouri law, an unconscionable ... provision in a contract will not be enforced. State ex rel. Vincent v. Schneider, 194 S.W.3d 853, 856-61 (Mo. 2006) (invalidating as unconscionable arbitration clauses requiring the consumer to pay for all arbitration fees and allowing an entity related to one of the parties to select the arbitrator). There are procedural and substantive aspects to unconscionability. Procedural unconscionability relates to the formalities of the making of an agreement and encompasses, for instance, fine print clauses, high pressure sales tactics or unequal bargaining positions; substantive unconscionability refers to undue harshness in the contract terms. Cicle v. Chase Bank USA, 583 F.3d 549, 554 (8th Cir. 2009); Whitney v. Alltel Comm'cs, Inc., 173 S.W.3d 300, 308-14 (Mo. Ct. App. 2005); Fay v. New Cingular, Wireless, PCS, LLC, No. 4:10CV883 HEA, 2010 U.S. Dist. LEXIS 124831, 2010 WL 4905698, at *2 (E.D. Mo. Nov. 24, 2010). "Generally there must be both procedural and also substantive unconscionability before a contract or clause can be voided." Whitney, 173 S.W.3d at 308; see also Kan. City Urology, P.A. v. United Healthcare Servs., 261 S.W.3d 7, 15 (Mo. Ct. App. 2008) (reversing the trial court's finding that arbitration clause was void where the trial court found only substantive unconscionability and not procedural unconscionability).

Kenner v. Career Educ. Corp., No. 4:11CV00997, 2011 U.S. Dist. LEXIS 136484, at *8-9 (E.D. Mo. Nov. 29, 2011).

> A contract of adhesion, as opposed to a negotiated contract, is a form contract that is created and imposed by the party with greater bargaining power. Robin v. Blue Cross Hospital Service, Inc., 637 S.W.2d 695, 697 (Mo. banc. 1982). The "stronger party" has more bargaining power than the "weaker party," often because the weaker party is unable to look elsewhere for more attractive contracts. Id. The contract is offered on a "take this or nothing" basis. State ex rel. Vincent v. Schneider, 194 S.W.3d 853, 857 (Mo. banc. 2006). The terms in the contract are imposed on the weaker party and "unexpectedly or unconscionably limit the obligations and liability of the [stronger party]." Robin v. Blue Cross Hospital Service, Inc., 637 S.W.2d 695, 697 (Mo. banc. 1982).

<u>Finnie v. H&R Block Fin. Advisors, Inc.</u>, No. 07-429-CV-W-NKL, 2007 U.S. Dist. LEXIS 74472, at *7-8 (W.D. Mo. Oct. 4, 2007)

Allied argues that the Agreement is substantively and procedurally unconscionable. (Response, pp. 14-18).  Allied contends that it is procedurally unconscionable because of Allied's lack of knowledge and lack of voluntariness in entering into the Agreement.  (<u>Id.</u>, pp. 16-18).  Allied argues that Section 11 essentially turns the Agreement into an insurance policy for CMI whereby Allied must indemnify and insure against any and every defect in the loans it sold CMI, regardless of whether it was aware of the defect.  (<u>Id.</u>, p. 15).  Allied argues that it did not have knowledge that the "safe harbor," afforded by Section 2(i), would be rendered meaningless by the unilateral imposition of a strict liability interpretation of Section 11.  (<u>Id.</u>, p. 17).  Allied notes that the CMI Manual consists of thousands of pages and asserts that CMI essentially drowned Allied in a "flood of paperwork" that it knew "would not and could not be read in time for the signing of the contract." (<u>Id.</u>).  Allied also argues that the Agreement was not voluntary because Allied had to accept it "as is" even though the Agreement is patently one-sided.  (<u>Id.</u>).  In addition, Allied contends that the Agreement is substantively unconscionable due to the harsh contract terms.  (<u>Id.</u>, p. 18).  Basically, Allied argues that it was allocated all of the risk of the loans, without affording Allied any benefit for the assumption of that risk.  (<u>Id.</u>).

Similar to its argument that the Agreement was unconscionable, Allied argues that the Court should not enforce the Agreement because it was a contract of adhesion.  (<u>Id.</u>, pp. 18-19).  Allied asserts that if it had known that the standardized provisions, particularly Section 11, would have been interpreted as "an insurance policy, whereby it was obligated to forever indemnify CMI for any defect existing with regards to the Subject Loans, regardless of whether Allied could have even known of such defects" then it would not have entered into the Agreement.  (<u>Id.</u>).  Accordingly, Allied argues that the Court should not enforce the Agreement.

In the instant case, the Court finds that the affirmative defenses of unconscionability and adhesion are not available to Allied because it, like CMI, is a sophisticated business entity. There is no gross disparity between the parties. Allied and CMI are both well versed in reviewing and negotiating contract language. The Court finds that both parties were fully capable of negotiating or altering the contract language to effect any change desired. Moreover, the Court does not believe that the Agreement is so "one-sided" that it could be considered unconscionable or a contract of adhesion. Allied clearly benefitted from their Agreement. During the course of their Agreement, Allied sold CMI over 2,560 loans, constituting over three hundred and sixteen million dollars worth of business. (Reply, p. 24). Thus, Allied's affirmative defenses of unconscionability and adhesion fail.

### 4.        In Pari Delicto, Unclean Hands, and Laches

In its Answer, Allied raises the equitable defenses of in pari delicto, unclean hands and laches. "Pari delicto is Latin for 'equal fault.' The in pari delicto doctrine is the principle that a plaintiff who participated in wrongdoing may not recover damages based on the wrongdoing." In re Senior Cottages of Am., LLC, 482 F.3d 997, 999, n.3 (8th Cir. 2007). Likewise, the doctrine of unclean hands is a defense that bars one who has acted wrongfully with respect to the subject of the suit from obtaining an equitable remedy. Sangamon Assocs., Ltd. v. Carpenter 1985 Family P'ship, Ltd., 165 S.W.3d 141, 145 (Mo. 2005)(citing Karpierz v. Easley, 68 S.W.3d 565, 572 (Mo. App. 2002)). Finally, "[l]aches may be used to bar a lawsuit when the plaintiff is guilty of (1) unreasonable and unexcused delay, (2) resulting in prejudice to the defendant." Whitfield v. Anheuser-Busch, Inc., 820 F.2d 243, 244 (8th Cir. 1987)(citing Goodman v. McDonnell Douglas Corp., 606 F.2d 800, 804 (8th Cir. 1979)).

In its Memorandum, CMI argues that these defenses are "not available as a matter of law because CMI is not seeking an equitable remedy." (Memorandum, p. 24). In response, Allied

- 16 -

claims that it is entitled to the affirmative defenses of in pari delicto (defense no. 12), unclean hands (defense no. 13), and laches (defenses no. 14) because CMI seeks equitable relief in its First Amended Complaint, specifically, "an order requiring Defendant to perform its obligations under the Agreement, including, but not limited to, repurchase of defective loans."  (Response, p. 20). Allied claims that this Court must deny CMI's motion for summary judgment because CMI argued that its only basis for denying these affirmative defenses was that it was not seeking equitable relief. (Id.).

In reply, CMI contends that it has not moved for summary judgment on its claim for equitable relief; it has only moved for money damages.  (Reply, p. 26).  CMI asserts that it is not required to seek each and every type of relief sought in the Complaint.  (Id.).  In addition, CMI contends that, contrary to Allied's claim, it has addressed the substantive deficiencies in Allied's affirmative defenses.  (Memorandum, pp. 24-26; Reply, pp. 26-27).  First, with respect to unclean hands and in pari delicto, CMI asserts that the undisputed facts do not evidence any tortious or criminal activity or other conduct capable of serving as a basis for either defense.  (Memorandum, p. 25; Reply, p. 26).  Nor has Allied identified any tortious or criminal activity by CMI.  (Reply, p. 26).  With respect to its laches defense, CMI argues that the laches defense is unavailable because "'the doctrine of laches will not bar a suit before expiration of the period set forth in the applicable statute of limitations in the absence of special facts demanding extraordinary relief.'"  Lane v. Non-Teacher Sch. Emple. Ret. Sys. of Mo., 174 S.W.3d 626, 640 (Mo. Ct. App. 2005)(quoting State ex rel. Gen. Elec. Co. v. Gaertner, 666 S.W.2d 764, 767 (Mo. banc 1984)); Memorandum, p. 26; Reply, pp. 26-27.  CMI notes that the statute of limitations has not expired, and Allied has not identified any facts that would justify the "extraordinary" relief of allowing a laches defense. (Memorandum, p. 26; Reply, pp. 26-27).  Moreover, CMI claims that a laches defense is

- 17 -

inapplicable because CMI has not delayed bringing suit after Allied failed to repurchase the loans. (Id.).

The Court finds that Allied has failed to provide evidence to support the affirmative defenses of in pari delicto, unclean hands, and laches.  Allied has not demonstrated that CMI was involved in any tortious or criminal activity that would warrant application of the in pari delicto and unclean hands defenses.  Likewise, Allied is not entitled to the laches defense because the statute of limitations has not expired and because there has been no allegation that CMI delayed in filing suit. Accordingly, the Court finds that these equitable defense are not available to Allied as a matter of law.[6]

### C.    Absolute Defenses to Liability

Based upon the operation of Section 2(i) of the Correspondent Agreement, Allied argues that it did not breach any of the terms of the Agreement and, therefore, CMI has no valid basis for demanding that Allied repurchase and/or indemnify CMI for the Loans.  That is, Allied claims it originated the Loans with the "utmost" due diligence and is shielded from liability pursuant to Section 2(i).  (Response, pp. 20-28).

This argument, however, is premised upon a reading of Section 2(i) which has already been rejected by this Court. As previously discussed, the cure or repurchase clause of Section 11(ii) allows CMI to demand repurchase at any time if it discovers a borrower's material misrepresentation, "even if Allied complied with Citimortgage's guidelines when originating the loan." See OCM Bancorp, Inc., 2011 U.S. Dist. LEXIS 45437, at *15-16.  Section 11(ii) does not

---

[6]Because the Court addresses the substance of these defenses, the Court need not address CMI's argument that it is not proceeding on its equitable claims and, therefore, the equitable defenses do not apply.

have any "qualifying language" that CMI can only demand repurchase if it determines that Allied knew of the borrower's misrepresentation. Id.

In addition, Allied asserts that it is not liable to repurchase or indemnify CMI for Loans involving income and/or asset misrepresentations because this information was immaterial to CMI's decision to purchase the Loans.  (Response, pp. 25-26).  Allied notes that all of the Loans were originated pursuant to CMI's Stated Income loan product guidelines, which precluded Allied from verifying income and/or assets.  (Id.).  Given that Allied was forbidden from verifying the borrowers' income and assets, Allied argues that CMI cannot claim that this information was material to its decision to purchase the Loans.  (Id.).

In response, CMI claims that the borrowers' representations of income and assets were material, and that Allied has not provided any evidence to support its claim that these representations were not material to CMI.  (Reply, pp. 17-19).  CMI states that it would not have asked borrowers their income if it were not material to CMI's decision to purchase the loan.  (Id., p. 18).  The borrowers' representations in the Uniform Residential Loan Application were made subject to criminal and civil penalties for falsehood. (Id.).  CMI, thus, contends that the borrowers' statements of income on the loan applications were the means it used to determine the borrowers' incomes for Stated Income Loans.  (Id.).  As noted by CMI "[n]othing in the Agreement required Allied to originate loans as Stated Income Loans as opposed to originating the loans under a full documentation program."  (Id.).  Because Allied chose to originate the Loans and sell them to CMI as Stated Income Loans, "Allied assumed the risk that it would have to repurchase any Loans that CMI determined had been originated or sold to it on the basis of a material misrepresentation or misstatements of fact."  (Id.).  As evidence that CMI considered the borrowers' income statements to be material, CMI notes that Allied placed its broker for the Weston Loan, a Stated Income Loan, on its "list of suspended brokers' because Allied had discovered 'misrepresentation [sic] in the

verification of employment as well as fictitious bank statements' in connection with the Weston Loan's origination."  (SSUF Response, ¶71; Reply, p. 19).  There, Allied did not claim that the misrepresentations or misstatements were not material, but told its broker, "[t]his incident is serious and should require your immediate attention."  (Reply, p. 19).

The Court agrees with the OCM court's determination that a borrower's "substantially misrepresented income" constitutes "a material misrepresentation as a matter of law."  OCM Bancorp, Inc., 2011 U.S. Dist. LEXIS 45437, at *16.  "Under Missouri law, 'a misrepresentation is deemed material where it is reasonably calculated to affect the action and conduct of the company in deciding whether or not to accept the risk by issuing its policy covering the risk.'"  Id. (quoting Continental Cas. Co. v. Maxwell, 799 S.W.2d 882, 889 (Mo. Ct. App. 1990)).  The Court finds that this is an instance where the "the materiality of a misrepresentation is so clear that it should be declared material as a matter of law."  Continental Cas. Co., 799 S.W.2d at 889; OCM Bancorp, Inc., 2011 U.S. Dist. LEXIS 45437, at *16-17.  As noted by CMI, and which Allied does not dispute, a borrower's income is "perhaps the most important and material factor in determining the ability of the borrower to pay back the loan."  (Reply, p. 18). "[A] potential borrower's income affects the decision of whether or not to underwrite a loan to that borrower, and, in turn, affects whether [CMI] will want to invest in that loan in the secondary loan market."  OCM Bancorp, 2011 U.S. Dist. LEXIS 45437, at *17.  Thus, the Court finds that "a borrower's substantially misrepresented income is a material misrepresentation, and so [CMI's] discovery of a borrower's misrepresented income would entitle it under the parties' agreement to demand that OCM repurchase the loan for containing material misrepresentations."  Id.

**CONCLUSION AND RELIEF**

Thus, the Court concludes that the Agreement, by its plain and unambiguous terms, allowed CMI, in its sole and exclusive discretion, "to demand repayment if it discovered (1) any material

misrepresentations by the borrower, including substantially misrepresented income; or (2) that the loan was originated in violation of its guidelines."   OCM Bancorp, 2011 U.S. Dist. LEXIS 45437, at *31.  Because the undisputed evidence reveals misrepresentations from the borrowers in the nine Loans at issue and because CMI demanded repurchase of the Loans, Allied breached the Agreement by failing to repurchase these Loans.  Similarly, Allied has failed to prove any affirmative defense that would preclude entry of judgment in favor of CMI.

In its Motion for Summary Judgment CMI requests money damages in the amount of $1,084,639.05, arising from Allied's failure to repurchase the nine Loans.   Allied has not objected to the calculation of these damages or CMI's methodology.  By entering into the Agreement, Allied consented to this method of calculating CMI's damages based upon application of the Repurchase Price formula set forth in Section 2301 of the Agreement.  (SUMF, ¶¶92-102).  Accordingly, the Court finds no basis for denying CMI's request for relief and awards to CMI damages in the amount of $1,084,639.05.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment [58] is **GRANTED**.

**IT IS FURTHER ORDERED** that CitiMortgage, Inc.'s Motion to Exclude the Opinions of Donald Coker [52] and Plaintiff CitiMortgage, Inc.'s Motion to Strike Affidavit of Wendy Monaco [76] are **DENIED** as moot.

**IT IS FINALLY ORDERED** that judgment is hereby entered in favor of CitiMortgage, Inc. and against Allied Mortgage Group, Inc. in the amount of $1,084,639.05.

An appropriate Judgment will accompany this Memorandum and Order.

Dated this 24th day of October, 2012.


JOHN A. ROSS
UNITED STATES DISTRICT JUDGE